# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                                                      No. CR 15-1030 JB

MANUEL DE JESUS SANDOVAL-ENRIQUE,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum, filed February 11, 2016 (Doc. 25). The Court held sentencing hearings on May 14, 2015, September 29, 2015, and March 14, 2016. The primary issue is whether a sentence of time-served is sufficient, but not greater than necessary, to comply with the statutory directives in 18 U.S.C. § 3553(a), when Defendant Manuel De Jesus Sandoval-Enrique has been convicted four times, including this case; been deported six times, before this case; and has returned to the United States of America after serving a sentence of 16 months in prison. Because Sandoval-Enrique returned to the United States for purely economic reasons, even after serving a 16-month prison sentence, the Court concludes that a time-served sentence -- which is approximately 45 days less than a sentence at the high end of the United States Sentencing Guidelines range -- will not be sufficient to comply with § 3553(a)'s directives. Accordingly, the Court denies the requests in Sandoval-Enrique's Sentencing Memorandum for a time-served sentence -- about twelve months -- and imposes a sentence at the high end of the Guidelines range: 16 months, which, with good behavior, is approximately a 14-month sentence.

## FACTUAL BACKGROUND

The Court takes its facts from the revised Presentence Investigation Report (disclosed December 22, 2015)("PSR").[1]  Sandoval-Enrique was born in San Pedro Sula, Honduras to Maria De Jesus Sandoval, who is deceased, and Pablo Sandoval, also deceased.  See PSR ¶ 34, at 7.  He has three siblings.  See PSR ¶ 34, at 7.  He has been married for twenty-two years to Maria Aguilar-Sandoval, and together they have six children.  See PSR ¶ 35, at 7.  Sandoval-Enrique reports six years of formal education in Honduras.  See PSR ¶ 39, at 8.  His usual occupation is as a construction worker.  See PSR ¶ 40, at 8.

In Honduras, Sandoval-Enrique worked as a driver for Pepsi.  "He used the money he earned at his job to build a house for him, his wife Maria, and their six children."  Sentencing Memorandum at 4.  Unfortunately, San Pedro Sula is flooded with gang violence.  See Luke Mogelson, The Departed, The New York Times Magazine (Dec. 9, 2015), http://www.nytimes.com/2015/12/13/magazine/the-deported.html?_r=3; Sibylla Brodzinsky & Ed Pilkington, US Government Deporting Central American Migrants to Their Deaths, The Guardian (Oct. 12, 2015), http://www.theguardian.com/us-news/2015/oct/12/obama-immigration-deportations-central-america?CMP=share_btn_link.  While Sandoval-Enrique worked for Pepsi, he was able to pay the gangs their "rent" and thereby avoid their wrath.  Sentencing Memorandum at 4.  By "paying them 500 Honduran Lempiras (approximately $22) a month for himself as well as 500 Lempiras a month for the business (so that he could perform his soda delivery in peace)," he could avoid harm to him and his family.  Sentencing Memorandum at 4.  Due to his relatively advanced age, Pepsi laid off Sandoval-Enrique.  The gangs

---

[1]The United States Probation Office disclosed an earlier PSR based on the Fast Track Plea Agreement between Sandoval-Enrique and the United States.  See May PSR (disclosed May 1, 2015)("May PSR").  Although the facts did not change, the Court will cite the most recent PSR.

nonetheless demanded that Sandoval-Enrique either pay them or turn over his home as a means of payment.  <u>See</u> Sentencing Memorandum at 4.  To pay the gangs and keep his family safe, Sandoval-Enrique illegally entered the United States to obtain work and make money for his family.  <u>See</u> Presentence Investigation Report at 1-2 (disclosed in the Western District of Texas in Docket No. EP-06-CR-1864 on December 19, 2006)("Texas PSR")("Sandoval-Enrique stated due to the economic conditions of Honduras he felt helpless and believed the only way he could make enough money for his family would be to find employment in the United States.").

Since the time when Sandoval-Enrique initially began illegally entering the United States, he has been convicted four times, including this conviction, and arrested three additional times in cases that were later dismissed.  <u>See</u> PSR ¶¶ 26-27, at 6.  First, on August 6, 2000, Sandoval-Enrique was arrested for shoplifting and concealment of goods in Mecklenburg County, North Carolina.  <u>See</u> PSR ¶ 30, at 6.  The charges were later dismissed.  <u>See</u> PSR ¶ 30, at 6.  Second, on October 29, 2001, Sandoval-Enrique was convicted and sentenced by the Western District of Texas to 145 days in custody for illegally entering the United States.  <u>See</u> PSR ¶ 23, at 5.  On April 4, 2002, he was deported to Honduras.  <u>See</u> PSR ¶ 23, at 5.  Third, on November 2, 2004, Sandoval-Enrique was arrested in Imperial, California for theft.[2]  <u>See</u> PSR ¶ 31, at 7.  Fourth, on November 19, 2005, he was arrested for unlawful entry in Washington, D.C.  <u>See</u> PSR ¶ 32, at 7. The charges were later dismissed, but the USPO was unable to locate further documentation surrounding this arrest.  <u>See</u> PSR ¶ 32, at 7.  Fifth, on May 9, 2006, Border Patrol agents "encountered the defendant in custody awaiting disposition on charges of Attempted Burglary and Possession of Burglary Tools, which occurred on December 15, 2005."  PSR ¶ 24, at 5.  The attempted burglary charges "were not pursued as the defendant was taken into immigration

---

[2]The USPO was unable to locate the records surrounding this arrest.  <u>See</u> PSR ¶ 31, at 7.

custody." PSR ¶ 24, at 5.  The Southern District of New York then convicted him of illegal reentry and sentenced him to 43 days' time served and a 3-year supervised release term.  PSR ¶ 24, at 5.  He was deported to Honduras on July 6, 2006.  See PSR ¶ 24, at 5.  Sixth, on September 10, 2006, shortly after he was deported, Border Patrol agents encountered Sandoval-Enrique attempting to enter the United States through the Mexico-Texas border.  See PSR ¶ 25, at 5-6.  He was convicted of illegal reentry by the Western District of Texas.  See PSR ¶ 25, at 5-6.  The Western District of Texas sentenced him to 16 months in custody with a 3-year term of supervised release.  See PSR ¶ 25, at 5.  Additionally, the Southern District of New York revoked Sandoval-Enrique's supervised release and sentenced him to 6 months in custody to be served consecutively with the Western District of Texas' sentence.  See PSR ¶ 24, at 5.  "Sandoval-Enrique admitted being a native and citizen of Honduras," and stated that his family still remained in Honduras.  Texas PSR at 1-2.  Sandoval-Enrique "was deported to Honduras via Houston, Texas."  PSR ¶ 25, at 6.  The PSR also notes that Sandoval-Enrique "has been found to be in the United States illegally on the following dates: October 20, 1995, March 26, 2002, December 1, 2004, April 11, 2005, July 4, 2005, and March 25, 2009."  PSR ¶ 28, at 6.

Because Sandoval-Enrique kept being deported and could not afford to pay the gangs, he and his family fled to Mexico where he was granted asylum and obtained safety.  See Sentencing Memorandum at 4.  In the years after Sandoval-Enrique obtained asylum in Mexico, he experienced difficulties obtaining employment.  See Sentencing Memorandum at 5.  He notes that "Mexico provided him the safety he and his family needed" and gave him the ability "to earn enough money for food and basic necessities."  Sentencing Memorandum at 5.  Nonetheless, he was unable to earn enough money to construct a home for his family.  See

Sentencing Memorandum at 5.  He states that this inability to provide for his family led him to enter the United States to pursue better work opportunities.  See Sentencing Memorandum at 5-6.

On February 28, 2015, United States Border Patrol agents arrested Sandoval-Enrique as he attempted to hide in a large ditch near Santa Teresa, New Mexico.  See PSR ¶ 7, at 3.  Sandoval-Enrique stated that he was a citizen of Mexico and that he did not possess legal authorization to enter or remain in the United States.  See PSR ¶ 7, at 3.

## PROCEDURAL BACKGROUND

On March 26, 2015, Plaintiff United States of America filed an Information in the United States District Court for the District of New Mexico charging Sandoval-Enrique with Reentry of a Removed Alien in violation of 8 U.S.C. § 1326(a)(1), (2) and § 1326(b)(1).  See Information at 1, filed March 26, 2015 (Doc. 9).  The Information alleges that Sandoval-Enrique reentered the United States "while an Order of Exclusion, Deportation, and Removal was outstanding."  Information at 1.  On March 26, 2015, Sandoval-Enrique pled guilty to the one-count Information.  See Fast Track Plea Agreement, filed March 26, 2015 (Doc. 12).

The Court will discuss the procedural background in three sections.  First, it will describe the PSR's sentencing Guidelines calculations.  Second, the Court will discuss the two previous sentencing hearings, where the Court rejected the plea agreements.  Third, the Court will discuss Sandoval-Enrique's Sentencing Memorandum and the third sentencing hearing.

### 1.    The First PSR.

The USPO disclosed its first PSR in May.  See May PSR (disclosed May 1, 2015)("May PSR").  It is identical to the revised PSR with one exception: the May PSR reduced the total offense level an additional 4 levels as a result of the Fast Track Plea Agreement between the United States and Sandoval-Enrique.  See May PSR ¶ 18, at 4.  Both the PSR and the May PSR state that Sandoval-Enrique's base offense level for a violation of 8 U.S.C. § 1326 is 8.  See PSR

¶ 12, at 4; May PSR ¶ 10, at 4.  They add 4 levels under U.S.S.G. § 2L1.2(b)(1)(D), because he

has previously been deported after a felony conviction.  See PSR ¶ 13, at 4; May PSR ¶ 11, at 4.

They make a 2-level reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility,

resulting in a total offense level of 10.  See PSR ¶¶ 19-20, at 4; May PSR ¶ 17, at 4.  The May

PSR, however, makes the additional 4-level reduction to reflect the plea agreement, resulting in a

total offense level of 6.  See May PSR ¶ 18, at 4.

        Sandoval-Enrique's past convictions result in 5 criminal history points.  See PSR ¶¶ 26-

27, at 6; May PSR ¶¶ 24-25, at 6.  A criminal history score of 5 establishes a criminal history

category of III.  See PSR ¶ 27, at 6; May PSR ¶ 25, at 6.  The May PSR states that, based upon a

total offense level of 6 and a criminal history category of III, the applicable guideline range is in

Zone B of the Sentencing Table, which means that

> the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a
> sentence of imprisonment that includes a term of supervised release with a
> condition that substitutes community confinement or home detention according to
> the schedule in USSG § 5C1.1(e), provided that at least one month is satisfied by
> imprisonment; or (3) a sentence of probation that includes a condition or
> combination of conditions that substitute intermittent confinement, community
> confinement, or home detention for imprisonment according to the schedule in
> USSG § 5C1.1(e).

May PSR ¶ 42, at 8.  Pursuant to U.S.S.G. § 5D1.1(c), the court "ordinarily should not impose a

term of supervised release in a case in which supervised release is not required by statute and the

defendant is a deportable alien who likely will be deported after imprisonment."  PSR ¶ 48, at 9.

        The May PSR states that it has not identified any information "concerning the offense or

the defendant which would warrant a departure from the advisory guideline range."  May PSR ¶

58, at 10.  The May PSR identified factors that relate to 18 U.S.C. § 3553(a) that bear upon

whether a guideline sentence is warranted.  First, it found that Sandoval-Enrique has two prior

felony reentry offenses, and "was sentenced to a term of 16 months on his last felony reentry

offense." May PSR ¶ 59, at 10. Second, the May PSR explained that Sandoval-Enrique "has been married for 22 years and he has two adult daughters and four minor children." PSR ¶ 59, at 10. Based upon these factors, and in consideration of 18 U.S.C. § 3553(a), the PSR recommends a sentence within the advisory guideline range. See PSR ¶ 61, at 10.

### 2.   The Court's Rejections of the Two Plea Agreements.

The Court held its first hearing on May 14, 2015. See Transcript of Hearing (taken May 14, 2015)("May Tr.").[3]  In the Fast Track Plea Agreement, the United States agreed to "a four-level downward departure pursuant to U.S.S.G. § 5K3.1," resulting in a total offense level of 6. Fast Track Plea Agreement at 3. Based upon a total offense level of 6 and a criminal history category of III, the guideline imprisonment range is 2 to 8 months. See May PSR ¶ 42, at 8. After the Court "studied his immigration history, his three convictions, . . . his six deportations," and the PSR's recommendation, it expressed its concern that the plea agreement was inadequate to sentence Sandoval-Enrique. May Tr. at 3:23-4:6 (Court). It observed that it was inclined to reject the plea agreement, because "it's just not going to reflect well the 3553(a) factors." May Tr. at 3:23-4:14 (Court).

Sandoval-Enrique argued that the Court should examine more than his most recent sentence of 16 months in prison. See May Tr. at 4:13-15 (Katze). He explained that threats of gang violence led him to acquire asylum in Mexico and relocate his family there. See May Tr. at 4:24-5:9 (Katze). He described how his difficulties obtaining work in Mexico drove his decision to find work in the United States. See May Tr. at 5:9-13 (Sandoval-Enrique). Further, Sandoval-Enrique argued, the arrests in his criminal history were "purely reentry crimes, immigration crimes, nonviolent crimes, not weapon offenses, not drug importation, not drug use." May Tr. at

---

[3]The Court's citations to the transcripts of the sentencing hearings refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

5:17-21 (Katze).  Sandoval-Enrique emphasizes that this criminal history reveals "a man who is struggling to provide for his family, and is a hard worker and is able to come to the United States and get work and make money."  May Tr. at 5:21-25 (Katze).

Additionally, Sandoval-Enrique contends that the law has changed, "because the policies and the sentencing ranges were inhumane, they were inhumane when we're a country of immigrants and we talk about people who come here just to work who are not committing violent crimes or not hurting people."  May Tr. at 6:22-7:3 (Katze).  Accordingly, he stated that "anything more than 2 to 8 months is inhumane and the fact that he got 16 months previously is not a reflection of how high it should be this time."  May Tr. at 7:4-10 (Katze).

The United States asked the Court to accept the plea agreement.  See May Tr. at 9:5-10 (Brawley).  It observed that the United States District Court for the Western District of Texas sentenced Sandoval-Enrique to 16 months before the nationwide fast track program was in place, which suggests that the sentence was higher than it would be now, with the program.  See May Tr. at 9:5-10 (Brawley).  Nevertheless, the Court observed that the plea agreement did not produce "adequate options for the Court."  May Tr. at 9:20-23 (Court).  It noted that Sandoval-Enrique had escaped the violence that he endured in Honduras, demonstrating that he entered the United States most recently for purely economic reasons.  See May Tr. at 9:23-10:8 (Court).  Consequently, the Court stated that an 8-month sentence "would not give the Court an ability to impose a sentence that promotes respect for the law, and affords adequate deterrence."  May Tr. at 10:9-16 (Court).  The Court granted Sandoval-Enrique's request to continue the hearing to determine whether to withdraw his plea or make another plea agreement with the United States. See May Tr. at 10:23-11:12 (Court, Katze).

On August 5, 2015, Sandoval-Enrique and the United States formed a new plea agreement.  See Plea Agreement, filed August 5, 2015 (Doc. 17).  Pursuant to rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agreed to a sentence of 10 months imprisonment.  See Plea Agreement at 4.  The Court held another sentencing hearing on September 29, 2015.  See Hearing of Transcript (taken September, 29, 2015), filed October 7, 2015 (Doc. 21)("Sept. Tr.").  Sandoval-Enrique raised many of the same arguments he made at the May Hearing.  See Sept. Tr. at 3:5-4:25 (Katze).  He argued that he kept returning to the United States "because he wants to work."  Sept. Tr. at 4:1 (Katze).

Sandoval-Enrique informed the Court that San Pedro Sula, Honduras "has the highest murder rate in the country" and is "considered the most dangerous city in the world."  Sept. Tr. at 4:5-10 (Katze).  He explained, "economically it's a very difficult situation in Mexico."  Sept. Tr. at 5:9-14 (Katze).  The United States agreed, asking the Court to accept the Plea Agreement. See Sept. Tr. at 6:19-24 (Walsh).  Despite Sandoval-Enrique's description of the danger in Honduras, the Court observed that his most recent illegal reentry was for economic reasons. Moreover, the Court observed that a 10-month sentence does not

> give the Court the options that it needs to sentence him correctly.  Sixteen months did not keep him out of the United States; 145 days didn't keep him out; 43 days didn't keep him out.  He's had six deportations.  I don't think a sentence of ten [months] is sufficient to reflect the 3553(a) factors.  It's not deterring him.  And I don't think a sentence of ten months is appropriate.

Sept. Tr. at 7:6-20 (Court).  Accordingly, the Court stated that it was "comfortable with a guideline sentence" and was inclined to sentence Sandoval-Enrique at the high end of the guideline range.  Sept. Tr. at 9:2-6 (Court).

### 3.    **The Revised PSR, the Sentencing Memorandum, and the Response.**

The only change to the revised PSR is that it does not reflect the plea agreement.  Under the revised PSR, "[b]ased upon a total offense level of 10 and a criminal history category of III,

the guideline imprisonment range is 10 months to 16 months."  PSR ¶ 44, at 8.  The PSR

observes that the guideline range "is in Zone C of the Sentencing Table," which means that

> the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a
> sentence of imprisonment that includes a term of supervised release with a
> condition that substitutes community confinement or home detention according to
> the schedule in subsection (e), provided that at least one-half of the minimum
> term is satisfied by imprisonment.

PSR ¶ 44, at 8 (citing U.S.S.G. § 5C1.1(d)).  The statutory maximum imprisonment term under 8

U.S.C. § 1326(a)(1)-(2), and 8 U.S.C. § (b)(1) is ten years.  See PSR ¶ 43, at 8.  The Court may

instead impose a term of supervised release of not more than three years under 18 U.S.C. §

3583(b)(2).  See PSR ¶ 46, at 8.

 Consistent with his earlier arguments, Sandoval-Enrique again illustrates his hometown

in San Pedro Sula, Honduras as being overrun with gangs "who terrorize working-class citizens,"

giving the city "the highest homicide rate in the world."  Sentencing Memorandum at 4.  He cites

various articles that describe the terrible violence that takes place.  See Sentencing Memorandum

at 4 (citing Luke Mogelson, The Deported, The New York Times Magazine (Dec. 9, 2015),

http://www.nytimes.com/2015/12/13/magazine/the-deported.html?_r=3; Sibylla Brodzinsky &

Ed Pilkington, US Government Deporting Central American Migrants to Their Deaths, The

Guardian (Oct. 12, 2015), http://www.theguardian.com/us-news/2015/oct/12/obama-

immigration-deportations-central-america?CMP=share_btn_link).

 The Guardian article largely discusses the danger involved in deporting immigrants back

to Central America.  It states: "The US government is deporting undocumented immigrants back

to Central America to face the imminent threat of violence, with several individuals being

murdered just days or months after their return, a Guardian investigation has found."  Brodzinsky

& Pilkington, supra.  The New York Times Magazine article focuses on the dangers specific to

San Pedro Sula:

> Honduras is among the poorest and most violent countries in Latin America, and Villanueva's hometown, San Pedro Sula, has ranked as the city with the highest homicide rate in the world for the last four years. (In 2014, 1,319 of its 769,025 residents were murdered.) Much of the bloodshed is gang-related. During the 1980s, waves of refugees fled civil conflicts in El Salvador, Guatemala and Nicaragua, many settling in Los Angeles, where street gangs were proliferating. Among Central Americans, two dominant organizations established a vicious rivalry: the Mara Salvatrucha, or MS-13, and the 18th Street Gang. When tough-on-crime legislation during the 1990s generated mass deportations, thousands of California gang members were sent back to developing countries ill-equipped to receive them. In feeble, corrupt states like Honduras, the MS-13 and the 18th Street Gang flourished, brokering alliances not only with politicians, prison authorities and the police but also with Mexican and South American drug cartels. The narcotics trade fueled the war between the two groups with unprecedented access to weaponry and cash. In San Pedro Sula, as in many other places throughout the region, resources plus impunity equaled more murder, torture and rape.

See Mogelson, supra.

Sandoval-Enrique then describes the years after he obtained asylum in Mexico, again

explaining his difficulties obtaining employment.  See Sentencing Memorandum at 5.  He

expresses deep gratitude for his asylum, noting that "Mexico provided him the safety he and his

family needed" and gave him the ability "to earn enough money for food and basic necessities."

Sentencing Memorandum at 5.  Nonetheless, he justifiably complains that he was unable to earn

enough money to construct a home for his family.  See Sentencing Memorandum at 5.  He notes,

however, that he obtained safety in Mexico.  See Sentencing Memorandum at 5.  Sandoval-

Enrique argues that the Court must consider his dangerous situation in Honduras and his difficult

economic situation in Mexico when examining his history and characteristics under the §

3553(a) factors.  See Sentencing Memorandum at 5-6.

With respect to three other § 3553(a) factors, Sandoval-Enrique contends that a 10-month sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.  See Sentencing Memorandum at 6-7.  As support, he argues that the United States "no doubt heavily considered and weighted [these factors] during the development of the well-tested, now uniformly-accepted Fast Track Plea program."  Sentencing Memorandum at 6.  Regarding deterrence, he asserts that a 10-month sentence is adequate to deter further criminal conduct, even though he reentered the United States after the Western District of Texas imposed a 16-month sentence.  See Sentencing Memorandum at 7.  He argues that § 3553(a) "does not, as a rule, call for the imposition of a higher sentence."  Sentencing Memorandum at 7.  Additionally, Sandoval-Enrique argues that the Court should not impose a higher sentence, because "incarceration does not reduce offender recidivism."  Sentencing Memorandum at 8 (citing Roger Warren, Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries, National Center for State Courts (2007), and Mark W. Lipsey & Francis T. Cullen, The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews, 3 Ann. Rev. L. & Soc. Sci. 297, 302 (2007)).  Finally, Sandoval-Enrique argues that a 10-month sentence is warranted to avoid unwanted sentencing disparities.  See Sentencing Memorandum at 10-11.

The United States responded on February 18, 2016.  See United States' Response to Defendant's Sentencing Memorandum Filed February 11, 2016 (Doc. 25), filed February 18, 2016 (Doc. 28)("Response").  It devotes much of its argument to describing the fast track program.  See Response at 4-7.  It explains that, because Congress authorized certain downward departures under the fast track programs, Congress recognized that sentencing disparities that result from the program were warranted and would not violate § 3553(a)(6).  See Response at 5 (quoting United States v. Gonzalez-Zotelo, 556 F.3d 736 (9th Cir. 2009) and United States v.

Duarte-Hurtado, 295 F. App'x 273 (10th Cir. 2008)).   The United States recognizes that the Court "has the authority and the discretion to reject the fact track plea as well as any agreed-upon plea by the parties," but nonetheless argues that the Court should accept fast-track pleas, even when they result in some sentencing disparities.   Response at 7.   It states that, since it previously recommended a sentence below what Sandoval-Enrique now faces with a time-served sentence, it "agree[s] to a time-served sentence as requested by the defendant."   Response at 7.

The Court held the third sentencing hearing on March 14, 2015.   See Transcript of Hearing (taken March 14, 2015)("March Tr.").   Once again, Sandoval-Enrique told the Court of his life in Honduras, where he endured threats from violent gangs and had to flee to protect his family.   See March Tr. at 3:17-4:19 (Katze).   He similarly explained that he found safety in Mexico, but could not support his family.   See March Tr. at 4:19-25 (Katze).   He stated, however, that he feared that the United States might deport him to Honduras instead of Mexico. See March Tr. at 11:9-11 (Katze).   He argued that, while the Court must consider the factors in § 3553(a), it should not weight deterrence any heavier than the other factors.   See March Tr. at 5:23-6:5 (Katze).

United States Probation Officer Adam Duran recommended that the Court sentence Sandoval-Enrique at the high end of the Guidelines range.   See March Tr. at 8:11-16 (Duran). The Court asked whether Sandoval-Enrique would get credit for time served and good time.   See March Tr. at 8:5-10 (Court).   Mr. Duran asserted that Sandoval-Enrique would be credited for time served and good time, meaning that, even if the Court sentenced him at the high end of the

Guidelines range, he would serve only another 45 days instead of nearly 4 months.  See March Tr. at 8:21-24 (Duran).[4]

The Court then adopted the PSR's factual findings as its own as there was no dispute regarding them.  See March Tr. at 11:22-12:2 (Court).  There being no objection to the sentencing Guideline applications in the PSR, the Court also adopted those as its own.  See March Tr. at 12:3-5 (Court).  The Court stated that it carefully considered the factors in § 3553(a)(1) through (7) and other sentencing goals.  See March Tr. at 12:4-20 (Court).  The Court concluded that a sentence at the high end of the Guidelines range is appropriate, considering Sandoval-Enrique's repeated illegal reentries into the United States even after felony convictions.  See March Tr. at 13:14-25 (Court).  The Court observed that the United States offers fast-track plea agreements to "almost everybody . . . if they're eligible," but noted that the Court must make individualized determinations when warranted.  March Tr. at 13:4-9 (Court). The Court stated: "And that's what I have done here.  It's very individualized.  I try not to treat every defendant the same.  I understand for fast track purposes the Government may choose to do that, but I think as a court, it's very important to treat them individually."  March Tr. at 13:9-13 (Court).

Regarding deterrence, the Court informed Sandoval-Enrique that it read the articles that he had cited suggesting that imprisonment did not necessarily deter criminals.  See March Tr. at 16:19-21 (Court).  Nevertheless, the Court determined that a longer imprisonment term in this particular situation "may have discouraged him from coming back to the United States."  March Tr. at 16:21-24 (Court).  The Court explained that, after Sandoval-Enrique served his 16-month

---

[4]Sandoval-Enrique has served 402 days (approximately 13 months) in custody at the time of the hearing.  See Response at 4.

sentence, "it did deter him; he didn't come back until 2015.  So he stayed out for nine years." March Tr. at 14:22-15:1 (Court).

In addition to promoting deterrence, the Court asserted that § 3553(a) directed it to promote respect for the law.  See March Tr. at 13:20-25 (Court)("[H]e's been deported 6 times, he'll be deported a 7th time after this one.  He does have the three convictions so this is his fourth conviction.").   The Court added that "four convictions, [and] what will be seven deportations, . . . require that the sentence reflect respect for the law," in addition to just punishment.  March Tr. at 14:10-13 (Court).  The Court observed that each time Sandoval-Enrique entered the United States, the United States devoted valuable resources to arresting him, prosecuting him, and deporting him.  See March Tr. at 14:17-22 (Court).  Finally, the Court stated that it was imposing a Guidelines sentence, "so it avoids unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct."  March Tr. at 15:6-9 (Court).  Accordingly, the Court stated that the 16-month sentence "fully and effectively reflects each of the relevant factors in 18 U.S.C. § 3553(a)," and is "not greater than is necessary to comply with the purposes of punishment set forth in the Sentencing Reform Act." March Tr. at 15:23-16:7 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.

Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."   United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).   A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

---

[5]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory [.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding

that the Guidelines are advisory."). The Court must consider the Guidelines, see <u>Gall v. United States</u>, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see <u>Gall v. United States</u>, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See <u>United States v. Sierra-Castillo</u>, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-<u>Booker</u> have discretion to assign sentences outside of the Guidelines-authorized range . . . . "). <u>Accord</u> <u>United States v. Chavez-Rodarte</u>, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in <u>United States v. Booker</u> that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in <u>Kimbrough v. United States</u> that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their <u>United States v. Booker</u>-granted authority to post-Guidelines analysis "variances."  <u>Irizarry v. United States</u>, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.   Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is

"in a superior position to find facts and judge their import under § 3553(a) in each particular

case." Kimbrough v. United States, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has

concluded that the case of an illegal immigrant who re-entered the United States to provide for

his two children and two siblings was not materially differentiated from other re-entry cases, and,

thus, no variance from the Guidelines sentence was warranted.   See United States v.

Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14,

2010)(Browning, J.).  On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011

WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service

was not present to an unusual degree and, thus, did not warrant a departure, the Court found that

a variance was appropriate, because the defendant's military service was "superior and uniformly

outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he

served with distinction." 2011 WL 831279, at *14.

## ANALYSIS

In 18 U.S.C. § 3553(a), Congress directs courts to consider numerous factors when

imposing a sentence, including deterrence.  Although longer prison sentences may not always

---

United States v. Nolf, No. CR 10-1919-002 JB, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

yield a significant amount of deterrence or be the most important factor in the § 3553(a) calculation, incarceration serves some deterrence function and is at least one tool in the Court's arsenal to promote deterrence.  Given Sandoval-Enrique's history of repeatedly entering the United States illegally, § 3553(a)(2) suggests that the Court should impose a sentence at the high end of the Guidelines range.  Furthermore, § 3553(a)'s directives to: (i) promote respect for the law; (ii) provide just punishment; (iii) consider the nature and circumstances of the offense and the history and characteristics of the defendant; and (iv) avoid unwarranted sentencing disparities all indicate that the Court should impose a sentence at the high end of the Guidelines range. Accordingly, the Court will sentence Sandoval-Enrique to 16-months imprisonment.

## I.   THE COURT WILL IMPOSE A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE TO PROMOTE DETERRENCE.

Sandoval-Enrique spends a significant amount of time addressing the deterrence factor. He cites several articles to support his argument that longer sentences do not reduce recidivism. See Sentencing Memorandum at 8-11 (citing Roger Warren, Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries, National Center for State Courts (2007); Mark W. Lipsey & Francis T. Cullen, The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews, 3 Ann. Rev. L. & Soc. Sci. 297, 302 (2007); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Justice: A Review of the Research 28-29 (2006); and Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Justice 199, 201 (2013)). Sandoval-Enrique thereby suggests that longer prison sentences do not deter criminal conduct. See Sentencing Memorandum at 8.  He analogizes incarceration to "an old, rusty tool that didn't serve its purpose," and argues that the Court should therefore reevaluate the whole concept of deterrence.  Sentencing Memorandum at 8.

In one of Sandoval-Enrique's cited articles, Roger Warren, President Emeritus of the National Center for State Courts, writes that "[i]ncarceration actually results in slightly increased rates of offender recidivism." Warren, supra, at 32. He states that "inmates are somewhat more likely to commit further crimes than those not incarcerated, or incarcerated for shorter periods of time." Warren, supra, at 32. Similarly, scholars Mark Lipsey and Francis Cullen write that research does not support "the view that incarceration dissuades offenders from reoffending after they are released." Lipsey & Cullen, supra, at 301. They conclude that the "theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is thus not consistent with the preponderance of available evidence." Lipsey & Cullen, supra, at 302.

The Court has also reviewed the leading research and concluded that the weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed -- has little to no significant correlation to recidivism. See, e.g., Lin Song & Roxanne Lieb, Recidivism: The Effect of Incarceration and Length of Time Served 4-6, Wash. St. Inst. for Pub. Pol'y (Sept.1993), available at http://wsipp.wa.gov/ ReportFile/1152/Wsipp_Recidivism–The– Effect–of–Incarceration–and–Length–of–Time–Served_Full–Report.pdf (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders, 15 Criminology 387 (1977)(outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, Four Thousand Lifetimes: A Study of Time Served and Parole Outcomes, Nat'l Council on Crime & Delinquency (1973)(outlining the results of a study of over 100,000 male parolees and finding

that similarly situated offenders who served longer periods of incarceration were more likely to recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, The Effect of Time Served on Recidivism: An Interdisciplinary Theory, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism).  This trend obtains even for white-collar criminals. See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995).

> Thus, specific deterrence is a suspect ground for increasing incarceration, except insofar as the offender will be prevented -- though not "deterred" in the usual sense -- from committing additional crimes while in custody for the longer time period.  This concept, however, is distinct; it is referred to as incapacitation, and academics do not usually consider it to be a subcategory of specific deterrence. Professor Daniel Nagin explains:

>> The distinction between incapacitation and deterrence is also important for policy.  Crime prevention by incapacitation necessarily requires higher imprisonment rates and the attendant social costs.  By contrast, if crime can be deterred from occurring in the first place, there is no perpetrator to punish.  As a consequence, crime prevention by deterrence does not necessarily involve a trade-off between crime rates and imprisonment rates.

> Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economics, 2013 Annual Rev. Econ. 5:83, 84.  Both specific deterrence and incapacitation are, of course, valid considerations in sentencing, and the difference between the two may be more important to academics than to courts. Courts are bound to impose sentences consistent with 18 U.S.C. § 3553(a), and both considerations -- specific deterrence and incapacitation -- are reflected in the same two § 3553(a) factors: (a)(2)(B)'s mandate "to afford adequate deterrence to criminal conduct" and (a)(2)(C)'s mandate "to protect the public from further crimes of the defendant."  The Court concludes that specific deterrence is embodied more by (a)(2)(B) than (a)(2)(C), while incapacitation is embodied more by (a)(2)(C) than (a)(2)(B), but both statutory provisions support both considerations, and if Congress did not care to separate them, the Court must address them both when sentencing a defendant.  Thus, the Court must still

consider specific deterrence when sentencing, because Congress demands it; prevailing research simply indicates that alternatives to incarceration are generally more effective on this front.

United States v. Courtney, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.).

In addition to specific deterrence, however, the Court must also concern itself with general deterrence.  See United States v. Corchado-Aguirre, 2015 WL 10383207, at *28 (D.N.M. Aug. 31, 2015)(Browning, J.).  In the articles that Sandoval-Enrique cites, the authors agree that, although "lengthy prison sentences" may not deter a particular defendant, increasingly longer prison sentences do serve a general deterrent function, thereby deterring others from committing a similar crime.   Nagin, Deterrence in the Twenty-First Century, supra, at 231 (stating that increasingly longer prison sentences can have appreciable deterrent effects when defendants face a relatively shorter sentence to begin with).  See Warren, supra, at 24-25 (observing that the current sentencing policies reflect the goal of general deterrence); Lipsey & Cullen, supra, at 299 (observing that the existence of a criminal justice system that threatens wrongdoers with arrest and punishment deters many to refrain from crime, when they would likely break the law if there were no risk of detection and penalty).   Lipsey and Cullen clearly state: "Our focus here, however, is not on the nature and effects of that general deterrent effect but, rather, on what is often called specific deterrence."   Lipsey & Cullen, supra, at 299.   Section 3553(a) does not direct the Court to consider "specific" deterrence; it directs the Court to consider "deterrence," which includes both specific deterrence and general deterrence.   United States v. Corchado-Aguirre, 2015 WL 10383207, at *28.   Even if the specific deterrence may be negligible, the Court can still further the goal of promoting general deterrence through the imposition of prison sentences.

The Court has previously described how the literature largely demonstrates that incarceration serves a general deterrent function.

There is, however, comparatively more support for incarceration's general-deterrence value. An economic model of crime would have individuals committing crimes only when the benefit to the individual of committing the crime (*f,* for "fruits") outweighs the product of the likelihood of getting caught and brought to justice (*c,* for "certainty") multiplied by the detrimental impact of the punishment on the individual (*s,* for "severity"). If $f > c \cdot s,$ the individual will commit the crime, and if $f < c \cdot s,$ the individual will not commit the crime. The Court notes that this theory is not fully workable as written; several factors -- many of which would vary from person to person -- would need to be established. For example, *s* and *f* would have to be put into the same units. Commonly, *s,* the punishment for a crime, starts out in units of months of incarceration; *f,* the crime's benefit to the criminal, often starts out in units of dollars. A conversion factor would have to be established that essentially asks how much an individual would have to be paid to spend a month in prison. This conversion factor would likely vary from person to person, both on the basis of idiosyncratic personal preferences and for rational, predictable reasons, <u>e.g.</u>, an 80-year-old man with millions of dollars might be less apt to trade prison time for money than a 30-year-old without a cent to his name. Even a single person likely has more than one conversion factor, which marginally fluctuates over the number of months of incarceration involved; for example, there are often immense social and reputational costs to a person for serving his or her first month in prison -- <u>i.e.</u>, for being convicted and incarcerated at all -- but these costs are for the most part one-time-only, and do not double or triple upon serving two or three months in prison. The model would also have to account for: (i) the possibility of being arrested but not convicted, which might entail social and reputational costs, and even some jail time; (ii) the possibility of being suspected but not arrested, which may entail social and reputation costs; and (iii) the uncertainty, at the time the crime is committed, of what the exact punishment will be if convicted. These "intermediate" outcomes -- between the polar outcomes of being convicted, on one hand, and getting away scot free, on the other—necessitate transforming the right-hand side of the model formula into an integral, in which the various possible outcomes are assigned a probability, their detrimental impact multiplied by that probability, and each possible outcome's consequent product added together to obtain a final sum, which represents $c \cdot s.$ Analogous issues exist on the left-hand side of the formula -- the expected value of committing the crime. It is often not clear before committing the crime how much money -- or other non-monetary benefit, which can then be assigned a monetary equivalent -- will be earned by committing the crime, and, thus, the various possibilities and their corresponding likelihoods must be integrated.

None of these snags is fatal to the economic model; they just make the model's inputs difficult to obtain, and, in some cases, practically unknowable.

The model is theoretically sound, and accurately describes how an informed, rational actor would treat the decision whether to commit a crime.  Even though most criminals are not, themselves, "informed, rational actors," one would expect that their behavior would, <u>on average</u>, reflect the rational pursuit of incentives, <u>i.e.</u>, individuals who should not rationally commit crimes will commit them at roughly the same rate that individuals who "should" rationally commit crimes refrain from committing them, and thus the irrationalities in both directions cancel out, resulting in net rational behavior.  Thus, under the economic model, all Congress has to do to root out crime is to ensure that the crime's punishment and detection rate are sufficiently high to greatly outweigh the average fruits of the crime.  This end can be effectuated equally well with either severity of punishment or certainty of detection, as a proportional increase to either has the same effect on the right side of the equation.

The model, however, does not work in the real world; it has been falsified by empirical research.  The model is dead, and facts, not theory, killed it.  If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate.  For example, consider a crime with a certainty of 20% and a severity of 10 years, and assume that 100 people commit this crime.  Now assume that the certainty was raised—by way of increased resources devoted to police, investigation, prosecution, etc.—to 40%.  The number of people who commit the crime would go down from 100 to $x$.  This figure, $x$, is not a predictable number, *i.e.,* it is not necessarily 50, because to determine $x's$ value one would have to know more about $f$, and where $c \cdot s$ stood in relation to it both before and after the certainty modification.  Now assume, instead, that the certainty was left at 20% but the punishment was raised from 10 years to 20 years.  The number of people who commit the crime would again go down from 100 to $x$, and, although $x$ would still be an unpredictable number, it would be the same number as the number of people who committed the crime when the detection rate was doubled.

An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world.  <u>See</u> Isaac Ehrlich, <u>Participation in Illegitimate Activities: A Theoretical and Empirical Investigation</u>, 81 J. Pol. Econ. 521, 544–47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, <u>The Deterrent Effect of Perceived Severity of Punishment</u>, 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, <u>Certainty v. Severity of Punishment</u>, 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment

provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, Criminal Deterrence Research at the Outset of the Twenty–First Century, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, An Experimental Investigation of Deterrence: Cheating, Self–Serving Bias, and Impulsivity, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, Estimating the Economic Model of Crime with Individual Data, 94 Q.J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research 47 (1999); Robert Apel & Daniel S. Nagin, General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, The Deterrent Effect of Legal Sanctions on Draft Evasion, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, Criminal Deterrence: A Review of the Literature, J. Econ. Literature (forthcoming). Studies universally find that certainty of punishment has a far greater deterrent effect than severity of punishment. It is difficult to pin down the extent to which real-world (empirical) findings deviate from the one-to-one rate predicted by the economic model—i.e., whether certainty is twice as important, three times as important, or ten times as important—as it appears to differ in different contexts. Interestingly, studies also agree that another factor, which is entirely absent from the economic model, works to determine deterrence: the immediacy, or celerity, with which the crime is detected and the punishment meted out. The above studies generally find that both certainty and celerity have a greater impact on deterrence than severity.

It is not clear why certainty is so much more effective than severity at deterring criminal behavior; as is the case in many contexts, empirical studies can identify the "what" but not the "why." It is even less clear why celerity plays any role in a potential criminal's decision. The Court suspects that the average street-

level potential criminal is more well-informed about the likelihood of getting caught, and the quickness with which he will be caught, than he is about the sentence he will receive. From there, the potential criminal uses the information he has on hand to make his decision, and largely disregards the impact of severity, rather than trying to seek out specific information. Drug trafficking defendants, aliens returning after being deported, and Indians off the reservation are often shocked at the severity of federal sentences as compared to prior sentences they may have received in state and tribal systems; in the Court's experience, most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent.

What is clear, however, is that severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch. See, e.g., Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86–88, 97–98 (2013). It also seems likely that the behavior of sophisticated potential criminals would hew more closely to the economic model than that of unsophisticated, street-level criminals. Thus, general deterrence remains an important consideration . . . .

United States v. Courtney, 2014 WL 7472975, at *32 n.13. See United States v. Luna–Jasso, 2015 WL 1006390, at *15-18 (D.N.M. Feb. 19, 2015)(Browning, J.)(footnote omitted) (concluding that a Guidelines sentence would have a greater deterrent effect than the sentence that the defendant requested). General deterrence thus remains an important consideration, especially in cases like this one, where the defendant has reason to suspect, based on his past pattern of serving increasingly longer sentences for repeat offenses, that the punishment would increase with this particular offense.

Furthermore, Warren's alternative to deterring crime through incarceration is to institute various rehabilitation and prevention programs. See Warren, supra, at 33. Warren does not suggest that the Court can further deterrence by reducing prison sentences altogether and doing nothing more, as Sandoval-Enrique seems to suggest. According to his research, courts can further deterrence through intense rehabilitation and prevention programs. See Warren, supra, at 32-33. Without those programs available in this instance, however, Sandoval-Enrique does not

show how the Court can further deterrence without incarceration.  For example, given that Sandoval-Enrique will be deported immediately after he serves his sentence, he will not be eligible for any programs on supervised release that might help him avoid reentering the United States for economic reasons or otherwise.  Indeed, it is hard to imagine what such a program would look like, unless it was more aid to Mexico and Honduras, or cash payments to their citizens.  Obviously, these types of programs require the will of the political branches, and the sentencing court has very little ability to factor such nonexistent programs -- or even existing programs -- into its sentencing calculation.

As a result, the Guidelines advise that sentencing courts should not ignore "unsupervised" supervised release.  While some judges impose supervised release in sentences like this one, the Court has always thought such an approach is a bit like kicking the can down the road, postponing the tough decision on what to do with an alien who continues to enter the United States illegally.  The Court has not adopted that approach.  The Court believes that it is more appropriate to bite the bullet and devise an appropriate sentence now for the crime and defendant before the Court.  It thinks it should do what the Guidelines recommend and not impose supervised release, rather than saying we will punish you severely -- maybe -- next time.

Sandoval-Enrique also cites Nagin's article, Deterrence in the Twenty-First Century, to support his argument.  See Sentencing Memorandum at 9.  While the cited portions of Nagin's article suggest that longer prison sentences do not achieve a significant amount of deterrence, they do not indicate that longer prison sentences yield no general deterrent effects at all.  See Nagin, Deterrence in the Twenty-First Century, supra, at 230.  Rather, the article argues that the marginal deterrence from an incrementally longer sentence is not great enough to counterbalance the increased social and economic costs involved in incarcerating a person for that greater length

of time.  See Nagin, Deterrence in the Twenty-First Century, supra, at 201.  Scholars concede that "California's third strike provision" which imposes substantially higher prison sentences for three-time offenders, "does indeed have a deterrent effect."  Nagin, Deterrence in the Twenty-First Century, supra, at 230.  Nagin argues only that "on the basis of a cost-benefit analysis, [] the crime-saving benefits are so much smaller than the increased costs of incarceration . . . ."  Nagin, Deterrence in the Twenty-First Century, supra, at 230.  Any argument about whether to incarcerate or not incarcerate on the basis of cost should be addressed to the political branches -- not the courts.  If more deterrence can be achieved by incarceration, the court should not refuse to incarcerate due to costs.  Any argument that the marginal deterrence does not justify the cost should be made to Congress, who has the power to change the factors that judges may consider when imposing sentences.

　　　　Nagin's article supports the understanding that increasing the length of a defendant's sentence can have a material deterrent effect.  Specifically, he argues that increased "increments in short sentences do have a material deterrent effect."  Nagin, Deterrence in the Twenty-First Century, supra, at 231.  See Nagin, Deterrence in the Twenty-First Century, supra, at 201 (stating that, in contrast, "there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs").  His compilation of the research reveals that there are diminishing marginal deterrent returns to increasing sentence length.  See Nagin, Deterrence in the Twenty-First Century, supra, at 229-32.  One can compare the marginal utility of lengthier prison sentences to the law of diminishing marginal utility.  The law of diminishing marginal utility is an economic concept holding that, as a person increases consumption of a product, there is a decline in the marginal utility that person derives from consuming each additional unit of that product.

Kemezy v. Peters, 79 F.3d 33, 35 (7th Cir. 1996)(Posner, J.)(applying the principle to a punitive damages issue and arguing that the "losing $1 is likely to cause less unhappiness (disutility) to a rich person than to a poor one"); United States v. Valencia, 2015 WL 9703436, at *40 n.23 (D.N.M. Dec. 31, 2015)(Browning, J.)(describing the theory of diminishing marginal utility and observing that a "defendant making $1,000,000.00 per year could likely weather a 50-percent-of-total-income fine much more comfortably than a defendant making $20,000.00 per year, even though the two fines, as a fraction of income, are the same").  For example, the first plate of food one eats at a buffet is very good.  Once that person's hunger has been somewhat sated, however, the person's enjoyment of the second plate of food significantly diminishes.  If this person continues eating, he or she would eventually reach a point at which an additional plate of food would provide no utility.

Nagin's compilation of research suggests that prison sentences may abide by the same principle.  See Nagin, Deterrence in the Twenty-First Century, supra, at 231.  Nagin agrees that "increments in short sentences do have a material deterrent effect on a crime-prone population." Nagin, Deterrence in the Twenty-First Century, supra, at 231.  Lengthier sentences may continue to provide increased marginal deterrence up to a certain point at which the increased deterrent value levels off.   See   Nagin, Deterrence in the Twenty-First Century, supra, at 231. Accordingly, research strongly indicates that increases in sentence length have at least some general deterrent effect -- especially for criminals facing shorter sentences.[6]  The Court has

---

[6]Sandoval-Enrique cites Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Justice: A Review of the Research 28-29 (2006), to argue that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."   Sentencing Memorandum at 8-9.  To be entirely understood, however, this lone sentence must be explained in context.  Tonry argues that, when considering multiple other factors, marginal deterrence may be reduced to a minimum.  See Tonry, supra, at 29. For example, he contends that criminals' understanding that they will be offered plea bargains undercuts the deterrence inherent in a

arrived at this conclusion on multiple occasions, determining that the "severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch." United States v. Courtney, 2014 WL 7472975, at *32 n.13 (citing Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013)). See United States v. Luna-Jasso, 2015 WL 1006390, at *15-18.

By arguing that the Court should not impose a 16-month sentence on the basis that prison does not effectively deter, Sandoval-Enrique essentially argues that the Court should not consider deterrence at all. See United States v. Corchado-Aguirre, 2015 WL 10383207, at *18 ("Because the Court's only deterrence tool is increased severity, [the defendant] is, in essence, arguing that the Court should not consider deterrence in sentencing at all."). Although a longer sentence may not be necessary to deter all defendants in all situations, it is one of the few tools at the Court's disposal to encourage deterrence. See United States v. Corchado-Aguirre, 2015 WL 10383207, at *18. "The Court has no luxury to ignore the statute's factors, because Congress has mandated the Court to consider deterrence in crafting an appropriate sentence. See 18 U.S.C. § 3553(a)(2)(B). The Court must, thus, use the deterrent tools available to it in crafting sentences." United States v. Corchado-Aguirre, 2015 WL 10383207, at *18. The Court cannot select a different method to deter crime based on its own policy evaluation and ignore the tool that Congress has provided to promote deterrence: incarceration.

Moreover, it appears that a longer prison sentence will effectively deter Sandoval-Enrique in particular from reentering the United States. One of the articles that Sandoval-

---

longer sentence, because the plea bargain literally reduces that sentence. See Tonry, supra, at 29. Prosecutors and other factors outside of the Court's control, therefore, undermine some of the deterrent value in longer sentences.

Enrique cites supports the conclusion that, even if incarceration may not decrease recidivism rates at large, it may impact specific individuals based on their particular characteristics.  See Lipsey & Cullen, supra, at 302 (stating that "[s]imple recidivism rates are largely a function of the input characteristics of the respective offenders, especially risk characteristics such as prior offense history, age, and gender").  Sandoval-Enrique has a history of entering the United States illegally.  See PSR ¶ 28, at 6 (listing the 6 dates on which Sandoval-Enrique has been found in the United States illegally and thereafter deported).  Each time he received a short sentence, he returned to the United States within the next year or two.  See PSR ¶¶ 23-28, at 5-6.  After he served 16 months in prison in 2007, however, he was not again arrested until 2015.  See PSR ¶¶ 23-28, at 5-6.  Despite Sandoval-Enrique's contention that imprisonment does not effectively deter criminal conduct, it appears that a longer prison sentence may have effectively deterred Sandoval-Enrique before.  See March Tr. at 14:22-15:1 (Court)(explaining that, after Sandoval-Enrique served his 16-month sentence, "it did deter him; he didn't come back until 2015").  Sandoval-Enrique nearly concedes that his lengthy prison sentence deterred him from reentering the United States when he asserts that "[h]e had consciously decided not to return to the United States because he did not desire to ever experience the American penal system again, as he had in 2006."  Sentencing Memorandum at 6.  This sentence suggests that another 16-month sentence would again discourage Sandoval-Enrique from entering the United States, especially knowing that if he ever did return, he would likely face a higher sentence.

Although Sandoval-Enrique argues that a time-served sentence will adequately deter him, he provides no evidence of why or how it would do so, especially in light of the fact that a 16-month sentence did not permanently deter him from reentering the United States.  See Sentencing Memorandum at 7.  He argues only that § 3553(a) "does not, as a rule, call for the

imposition of a higher sentence." Sentencing Memorandum at 7. Contrary to Sandoval-Enrique's contention, however, the Court is not imposing a higher sentence. It is imposing the same length of sentence that the Western District of Texas imposed, and the Bureau of Prisons is likely to give him credit for time served and good time, making the sentence closer to 14 months. See March Tr. at 8:21-24 (Duran). In a situation where the defendant has not demonstrated any situational differences between his last reentry and this reentry, or, as here, the reasons are even less compelling in this case, the Court has no sound reason to conclude that a shorter sentence will deter him now, when it did not permanently deter him in the past. Accordingly, § 3553(a)'s deterrence objective suggests that the Court should impose a sentence at the high end of the guidelines.

Finally, the Court is always reluctant, unless it is trying to deter someone from committing a crime, to give time served. The first time that the defendant sees the sentencing judge is at sentencing, and if the first thing he sees is the judge giving time served, that scene would seem to undermine deterrence, because it might suggest that the Court does not take illegal reentry seriously or as seriously as the Executive Branch. It seems better that the defendant sees more time rather than just being released after the defendant first meets the judge. Because Sandoval-Enrique will serve about forty-five more days, his meeting with the Court helps emphasize that he must refrain from committing the crime again and that the judge takes this crime seriously.

## II.   THE REMAINING § 3553(a) FACTORS INDICATE THAT THE COURT SHOULD IMPOSE A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE.

In addition to promoting deterrence, § 3553(a) directs courts to promote respect for the law and provide for just punishment. See 18 U.S.C. § 3553(a)(2)(A). Sandoval-Enrique has been deported six times, and will be deported seven times after he serves his sentence. He has

four criminal convictions, including this one.  Moreover, each time Sandoval-Enrique enters the United States, the United States devotes valuable resources to arresting him, prosecuting him, and deporting him.  See March Tr. at 14:17-22 (Court).  By continuing to illegally enter the United States, Sandoval-Enrique disregards the law and the resources that the United States devotes to upholding the law.  Because this is Sandoval-Enrique's fourth immigration conviction, a longer sentence is necessary to promote respect for the law and to provide a just punishment.  United States v. Corchado-Aguirre, 2015 WL 10383207, at *28.  If the public were to examine this sentence, and the sentence were time served, the public would probably think that odd.  The Court is doubtful most people would see a time-served sentence as a just punishment or one that generates respect for the law.  Accordingly, § 3553(a)(2)(A) suggests that the Court should impose a sentence at the high end of the Guidelines range.

Sandoval-Enrique argues that, pursuant to § 3553(a)(2)(C)'s directive to consider the sentence's need to protect the public, he is less deserving of punishment because he did not harm anyone through his conduct.  See Sentencing Memorandum at 9.  The Court agrees in part.  Although the Court is concerned about Sandoval-Enrique's arrests, the number of arrests, and the crimes for which he was arrested, for the most part, it finds that he is not a great threat to the public.  This factor and these facts are why he is receiving only 16 months for his fourth violation of the same offense.  If he "had committed a more serious offense -- drug trafficking, assault, rape, fraud, or murder -- after being convicted of the same offense [three] times earlier, his sentence would most likely be significantly longer."  United States v. Corchado-Aguirre, 2015 WL 10383207, at *29.  That he is receiving only 16-months imprisonment for his fifth offense is a recognition that his offense is less serious than other crimes.  See United States v. Corchado-Aguirre, 2015 WL 10383207, at *29.  The Court notes, however, that Sandoval-

Enrique has been arrested for shoplifting and concealment of goods, see PSR ¶ 30, at 6, for theft, see PSR ¶ 31, at 7, and for attempted burglary and possession of burglary tools, see PSR ¶ 24, at 5.  Even though these charges were later dismissed, the PSR specifically notes that, at least with respect to the attempted burglary charges, they "were not pursued as the defendant was taken into immigration custody."  PSR ¶ 24, at 5.

Under § 3553(a)(1), the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Sandoval-Enrique asks the Court to remember the violent situation occurring in Honduras in considering his characteristics and the circumstances surrounding the offense.  See Sentencing Memorandum at 4-6.  While the Court is sympathetic to the situation in Honduras, it does not mitigate Sandoval-Enrique's crime in this case, because he did not enter the United States to flee violent gangs this time.[7]  See Sentencing Memorandum at 5.  He entered for purely economic reasons.  See Sentencing Memorandum at 5.  He concedes, both in his Sentencing Memorandum and at the hearings, that he found safety in Mexico, but he left that safety for economic reasons.  See Sentencing Memorandum at 5 (stating that "Mexico provided him the safety he and his family needed, relative to Honduras"); March Tr. at 4:19-25 (Katze); May Tr. at 9:23-10:8 (Court)(observing that Sandoval-Enrique had escaped the violence that he endured in Honduras, demonstrating that he entered the United States most recently for purely economic reasons).  He

---

[7]Sandoval-Enrique states that he might be deported to Honduras, which will put him back in danger.  He argues that the Court should reduce his sentence because of this danger.  The Court recognizes this fact, but it should not reduce his sentence because of it.  First, when Sandoval-Enrique was arrested, he said he is a citizen of Mexico.  See PSR ¶ 7, at 3.  If that is true, he may be released not to Honduras, but to Mexico.  His attorney was not able to verify his citizenship.  Second, if he is released to Honduras, that is something that Immigration Customs and Enforcement handles, not the Court.  The Court does not understand why reducing his sentence, which might put him back in danger faster, helps him.  In the end, this fact, while sad, does not put downward pressure on the sentence.

came here to get money and to build a house for his family.  Consequently, Sandoval-Enrique entered the United States for the same reason that countless defendants the Court sentences each year enter the country: to make money.  In many ways, Sandoval-Enrique is no different than the thousands of other Mexicans who come to the United States for better jobs.  In other words, there is nothing in the nature and circumstances of the offense that counsels for a variance, and the character of the defendant -- coming to the United States for purely economic reasons -- also does not counsel much, if at all, for a variance.

Next, pursuant to § 3553(a)(6), the sentence "avoid[s] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Sandoval-Enrique argues that the Court should not give Sandoval-Enrique a higher sentence simply to correct what it perceives to be a sentencing disparity between him and other non-fast track eligible defendants.  See Sentencing Memorandum at 10-11.  The United States similarly states that the fast track program warrants this disparity.  See Response at 5-7. The Court agrees that Congress warranted sentencing disparities between Fast-Track eligible and non-fast track eligible defendants.  See United States v. Duarte-Hurtado, 295 F. App'x 273 (10th Cir. 2008).  The Court does not, however, give Sandoval-Enrique a higher sentence simply to correct any such disparity.  See May Tr. at 10:9-16 (Court)(stating that an 8-months sentence pursuant to the fast track program did not promote respect for the law, provide for adequate punishment, or promote deterrence, and that Sandoval-Enrique's history and characteristics demonstrated that he entered the United States for purely economic reasons); Sept. Tr. at 7:6-20 (Court)(same).  Contrary to Sandoval-Enrique's suggestion, the Court is not imposing a 16-month sentence solely to match the sentence that the Western District of Texas imposed, where there was no fast track plea policy in 2006.  See Tr. at 6:10-13 (Katze); May Tr. at 7:4-10

(Katze).  The Court contradicted any suggestion that it was imposing a higher sentence to avoid such sentencing disparities when it noted at the hearing that it must make highly individualized determinations regarding sentencing.  See March Tr. at 13:4-9 (Court).  The Court stated: "And that's what I have done here.  It's very individualized.  I try not to treat every defendant the same.  I understand for fast track purposes the Government may choose to do that, but I think as a court, it's very important to treat them individually."  March Tr. at 13:9-13 (Court).  Instead, the Court merely observes that a 16-month sentence avoids any unwarranted disparities among defendants with similar records who have been found guilty of similar conduct, thereby complying with the precedent the United States cites from both the Ninth and Tenth Circuits.

In United States v. Gonzalez-Zotelo, the defendant's original Guidelines range was 63 to 78 months.  See 556 F.3d at 738.  The United States District Court for the Southern District of California first found that the criminal history over-represented the defendant's criminal history and departed downwards, resulting in a new range of 51 to 63 months imprisonment.  See 556 F.3d at 738.  Despite this new range, the court sentenced the defendant to 30 months imprisonment solely to reduce sentencing disparities between the defendant, who was not participating in the fast track program, and another fast-Track eligible defendant that had committed a similar crime.  See 556 F.3d at 738.  The Ninth Circuit held that the Southern District of California erred by imposing a significantly lower-than-Guidelines sentence solely to reduce a sentencing disparity that Congress had warranted.  See 556 F.3d at 739-41.

The Court does not commit the same error that the Ninth Circuit reversed in United States v. Gonzalez-Zotelo.  First, the Court notes that it does not impose a 16-month sentence to reduce sentencing disparities between Sandoval-Enrique and other defendants who are not eligible for the fast track program, like the Southern District of California did in United States v.

Gonzalez-Zotelo.  See 556 F.3d at 738.  Instead, the Court relies on numerous other § 3553(a) factors to reach its conclusion that it should impose a 16-month sentence.  Accordingly, it is not rejecting or disagreeing with Congress' approval of fast-track plea bargaining programs. Second, the Southern District of California had to depart downward 21 to 33 months to reach its sentence.  See 556 F.3d at 738.  The Ninth Circuit in United States v. Gonzalez-Zotelo reversed the Southern District of California's downward departure.  See 556 F.3d at 741.  In contrast, the Court's sentence of 16-months is a Guidelines sentence.  The Court makes no departures to match Sandoval-Enrique to non-fast-track eligible defendants.  Notably, the Court makes no departures to match the Western District of Texas' sentence, where there was no fast track plea policy at the time.  If the Court wanted to reduce sentencing disparities between the Western District of Texas' 2007 sentence and the Court's 2016 sentence, the Court would likely need to impose a higher sentence, considering that Sandoval-Enrique now has four criminal convictions. Instead, the Court relies on the § 3553(a) factors in the aggregate to arrive at its 16-month sentence.

Similarly, in United States v. Duarte-Hurtado, the Tenth Circuit affirmed the Court for refusing to vary the defendant's sentence solely to match defendants in the fast track program. See 295 F. App'x at 276.  Although the Court varied from the defendant's Guidelines sentence, it did so on the basis of the defendant's particular circumstance and concluded that the § 3553(a) factors in the aggregate suggested that a below-Guidelines sentence was appropriate.  See 295 F. App'x at 278-9.  The Tenth Circuit described the Court's approach:

> Next, it is evident the district court carefully weighed each of the circumstances presented, together with the § 3553(a) factors, in determining whether to grant a variance, and that one of the sentencing factors it believed tipped the balance in favor of granting the variance was § 3553(a)(6).  In applying this factor, the district court explained that a sentence of forty-one months, at the low end of the Guidelines range, would not reflect the same length of sentence received by

- 38 -

people who committed similar crimes and have similar records to Mr. Duarte-Hurtado.  It then concluded that in "[t]aking into consideration this factor, as well as the other variance factors . . . discussed," it believed "a sentence of 36 months balances these factors best." R., Vol. 1, Doc. 31 at 30.  Thus, it is clear no procedural error occurred.  Further, under *Smart*, we may not examine the weight assigned to any one factor in determining the substantive reasonableness of Mr. Duarte-Hurtado's sentence, and, instead, give due deference to the district court's decision the § 3553(a) factors, on a whole, justified the extent of the variance given.  *See* 518 F.3d at 808.

United States v. Duarte-Hurtado, 295 F. App'x at 278.  Like the Court did in United States v. Duarte-Hurtado, it again determines that the § 3553(a) factors, on a whole, justify the 16-months Guidelines sentence it imposes.

Furthermore, to determine whether "unwarranted sentencing disparities" exist, the Court must look beyond sentences that New Mexico federal courts impose and also consider sentences that courts along the border and across the county impose.  See March Tr. at 15: 10-16 (Court).  Looking exclusively at sentences that New Mexico federal courts impose is too narrow, because New Mexico sentences may be anomalous when compared to a broader sample.  See March Tr. at 15: 10-16 (Court).  As evidence that the Court's sentence avoids irrational disparities, the Court notes that the Western District of Texas gave Sandoval-Enrique a 16-month sentence when he had only two prior convictions and was entering the United States for safety reasons rather than purely economic reasons.  Finally, the Court observes that, with credit for time served and good time, Sandoval-Enrique will actually serve a sentence of around 14 months rather than 16.  See March Tr. at 8:21-24 (Duran).  Hence, the current dispute is over about forty-five days, although if the Court had accepted the Fast Track Plea Agreement, the dispute would be over 8 months' difference.

Finally, Sandoval-Enrique also argues that, by not accepting the Fast Track Plea Agreement here and sentencing him to 2 months or 8 months, the 10-month plea agreement, or to time-served, the Court is creating an unwarranted disparity with those who are sentenced under

the "nationwide" Fast Track Program.  See Sentencing Memorandum at 10-11.  He says that it is "arbitrary" that this Court was assigned to him rather than to other judges in the District of New Mexico who would have accepted his Fast Track Plea Agreement.   See Sentencing Memorandum at 10-11.  He therefore argues that this Court's sentence creates an unwarranted sentencing disparity.  See Sentencing Memorandum at 10-11.  He goes further, stating:

> And it is not that the other District Judges are not following the law, rather it is the aberrant policy of this Court that has spawned this arbitrary and intolerable disparity.  The weight of this 3553 factor alone, and the sheer injustice of this vast disparity, should outweigh, or at the very least balance out, any purported compliance with the other 3553 factors that this Court has stated can only be achieved with a lengthier sentence.

Sentencing Memorandum at 10.  As stated above, the Court looks beyond the District of New Mexico to determine whether a sentencing disparity exists.   Sandoval-Enrique's arguments assume that there are a lot more fast track plea agreements in this case than there really are and that there really is a "nationwide" fast track policy.  The Court has described the history of the fast-track policies previously:

> In the PROTECT Act of 2003, [Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003),] Congress gave the U.S. Attorney for each district the authority to create a fast-track or early disposition program for criminal cases.  [Id. § 401(m)(2)(B), 117 Stat. 650, 675 (2003) (codified as amended at 28 U.S.C. § 994 (2006)).]  Under a fast-track program, the defendant receives a downward departure of 1 to 4 levels if they accept an early plea.  [Id.]  In the District of New Mexico, a defendant charged with the felony of illegal re-entry could get a three-level departure if he has not committed a violent crime.  [U.S. Sentencing Commission       Guidelines       Manual       (2013),       http:// www.ussc.gov/sites/default/files/pdf/guidelines-manual/2013/manual-pdf/2013_ Guidelines_Manual_Full.pdf (hereinafter Guidelines Manual)].   If he had committed a violent crime in his past, he could still get a one-level departure. [Id.]
>
> As an example of the pre-fast-track sentencing structure, if the defendant was here illegally and committed a drug-trafficking crime in 2003, his base offense level would be at 8 for the crime of re-entry with a 12-level enhancement for the drug trafficking crime.  [Id.]  His offense level of 20 would have been

reduced three levels if he accepted responsibility, leaving him with an offense level of 17.  [Id.]  With a criminal history at level II, the guideline range for his sentence would have been 27 to 33 months.  [Id.]  When the judicial author of this Article came onto the bench in 2003 before Blakely v. Washington, [See Blakely v. Washington, 542 U.S. 296 (2004)] and United States v. Booker, [See United States v. Booker, 543 U.S. 220 (2005),] which turned the previously mandatory sentencing guidelines into advisory sentencing guidelines, the criminal offender mentioned above would have received a sentence of 27 months.

Starting on October 24, 2003, the District of New Mexico began following the fast-track program.  [Memorandum from James B. Comey, Deputy Attorney General, U.S. Dep't Justice, Authorization of Early Disposition Programs (Oct. 29, 2004), reprinted in 21 Fed. Sent. Rptr. (Vera) 322, 323 (2009).]  Under the fast-track program, the same defendant as above would have received an extra three-level downward departure for accepting the plea early.  [Guidelines Manual, supra.]  As a result, his offense level would have been reduced to 14, and with a criminal history at level II, the guideline range would call for a sentence between 18 and 24 months.  [Id.]

Then, in early 2012, the DOJ decided to standardize the fast-track programs across all districts.  [Memorandum from James M. Cole, Deputy Attorney General, U.S. Dep't Justice, Department Policy on Early Disposition or "Fast-Track" Programs (Jan. 31, 2012), available at http://www.Justice.gov/dag/fast-track-program.pdf.]  If a U.S. Attorney wants to implement a fast-track program, he or she has to use the one the DOJ drafts.  [Id.]  Before this, the U.S. Attorney for each district could tailor the program he or she implemented to the individual district.  For the District of New Mexico, this individualization meant that the same defendant as above would no longer get a four-level downward departure, but instead would get only the three-level departure implemented in 2003.  With an offense level of 13 and criminal history still at II, the sentence range for this particular post-2012 defendant would now be between 15 and 21 months.  The District went from a typical sentence of 27 months in early 2003 to a 15-month sentence in 2013.

Adding some complexity to the discussion is that some districts can and do choose to not implement a fast-track program at all.  [See id.]  As a result, sentences in the District of New Mexico tend to be lower than the sentences in those districts.  Moreover, in some districts, not every defendant would be charged with a felony.  In fact, most are charged with misdemeanors, so those other districts charging misdemeanor will likely impose shorter sentences than New Mexico's felony sentences.  There has been a steady downward pressure on sentences for illegal re-entry, especially in the border districts, but it is possible that in non-fast-track districts, the prosecutor's decision to charge the illegal immigrant with a misdemeanor or felony could place them either below or above the sentence she or he would receive in New Mexico.

In fact, outside the border districts, such as in the Northern District of Texas, some of the judges can give sentences that are twice as long as those given out in New Mexico for similar re-entry crimes.  For example, the judicial author once had a defendant in front of him who was sentenced to 96 months by a Northern District of Texas judge, but in New Mexico he ended up getting sentenced to 18 months.  [United States v. Calderon-Ramirez, CR 07-2066 JB, 2008 WL 2397661 (D.N.M. Jan. 30, 2008).]

It has been the policy of the judges of the District of New Mexico that they sentence a re-entry defendant to time as soon as possible.  This policy is exhibited in a number of different ways.  The District stations two district judges in Las Cruces, New Mexico.  [See District of New Mexico Judges, U.S. District Court, District of New Mexico, http://www.nmcourt.fed.us/web/DCDOCS/files/judges.html (last visited Aug. 23, 2013).]  It places nearly a third of the District's seven active judges in Las Cruces.  Moreover, having judges travel there to conduct sentencing in Las Cruces sentences people faster and is more cost efficient than moving those defendants to Albuquerque.

The District also stations five Magistrate Judges in Las Cruces.  [See id.] That means that more than half of the nine Magistrate Judges in the District are located near the border.  While Magistrate Judges can handle some tasks on a felony case, only a District Judge can try a felony case and, perhaps more important in this context, only a District Judge can sentence a convicted felon. [28 U.S.C. § 636(a).]  The nation also sends visiting judges from other Districts to sit in Las Cruces, and the District Judges from the north frequently go to Las Cruces.

Civil lawyers may often wonder as they wait months for a decision from a District Judge to come out in a civil case, what it is a Federal judge does with his or her time.  It is important to recognize, however, the impact the sheer number of illegal re-entry cases have on the resolution of every other civil and criminal case as well.  Even the northern judges in Albuquerque and Santa Fe, who are not sentencing as many re-entry cases as the judges in Las Cruces,[8] are sentencing many difficult re-entry cases.  [Id.]  Some of these more difficult sentences are because the defendants have complex and complicated criminal histories, so the defendant is not looking at time-served sentences, but long, contested sentences. Even when the court is not sentencing in a re-entry case, the volume of re-entry

---

[8]Memorandum from Matthew J. Dykman, Clerk of Court District of New Mexico, to the Honorable James O. Browning, Federal Judge District of New Mexico (Nov. 6, 2014)(on file with authors)(outlining the routine transfer of defendants who are charged with illegal reentry with a maximum sentence of 10 years or more given their prior criminal record to Federal District Court in Albuquerque.  In 2012, 349 such reentry cases were transferred to Albuquerque; in 2013, 419 such transfers occurred; and through Oct. 31, 2014, 421 such transfers have occurred in 2014.).

cases makes it difficult to get to other criminal cases, such as those arising in Albuquerque's metropolitan area and on the 22 Native American reservations and pueblos in the District.  New Mexico is not a sleepy backwater place when it comes to federal crime.  It has the fourth highest number of criminal fillings per Federal Judge out of the 94 Federal Districts in the nation.  [See U.S. District Courts-Weighted and Unweighted Filings per Authorized Judgeship During the 12-Month Period Ending September 30, 2012, U.S. Courts, http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2012/appendices/X01ASep12.pdf (last visited Aug. 23, 2013).]  New Mexico's 179.5-mile-long border with Mexico, [Janice Cheryl Beaver, Cong. Research Serv., U.S. International Borders: Brief Facts 2 (2006), http://www.fas.org/sgp/crs/misc/RS21729.pdf (last visited Aug. 31, 2013),] and three Native American reservations and 19 pueblos, [See Pueblos and Reservations, Albuquerque Convention & Visitors Bureau, http://www.itsatrip.org/albuquerque/culture-heritage/native-american/pueblos-reservations.aspx (last visited Aug. 31, 2013),] provide for a robust federal docket.

James O. Browning & Jason P. Kerkmans, A Border Trial Judge Looks at Immigration: Heeding the Call to Do Principled Justice to the Alien Without Getting Bogged Down in Partisan Politics: Why the U.S. Immigration Laws Are Not Broken (but Could Use Some Repairs, 25 U. Fla. J.L. & Pub. Pol'y 223, 258-60 (2014).

Hence, there is really no "nationwide" fast-track program; if a U.S. Attorney wants a fast-track plea, he or she can no longer tailor or customize one, and must take the off-the-shelf one that main Department of Justice has devised, but no U.S. Attorney has to have one.  Thus, there is built-in disparity from the fast-track program.  Defendants in some districts do not get the benefit of a fast track, while defendants coming into New Mexico do.  As many judges correctly point out, New Mexico defendants are known to get lighter sentences than elsewhere in the nation.  Judges' sentencing policies vary in the district.  Hence, it is very difficult in the nation, or even in the district, to avoid sentencing disparities among similarly situated defendants who have been found guilty of such reentry crimes.

Here, the Court gave Sandoval-Enrique a Guidelines sentence.  It gave him the same sentence that the Western District of Texas previously gave him in 2007.  These are good ways to avoid disparities.  Sandoval-Enrique's complaint that the Court's sentence is arbitrary is not accurate.  See Sentencing Memorandum at 10.  He chose what district to enter, and illegal aliens

are often knowledgeable about which districts have which sentencing policies.  Assignments in the district are random, but the sentencing practices vary.  Judges talk to each other and others, and New Mexico judges know that their sentences are often lower than the rest of the nation and some are troubled by the low sentences that the fast track program creates for repeat offenders. In any case, while there may be a bit of randomness in the assignment of a case, Sandoval-Enrique can rest assured that his sentence is not random nor arbitrary, but the product of extremely hard work.

In sum, as this Memorandum Opinion and the three sentencing hearings reflect, the Court has carefully considered the Guidelines, but in arriving at its sentence, the Court has taken account, not only of the Guidelines, but all the sentencing goals.  Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense committed by the applicable category of defendant.  After carefully considering Sandoval-Enrique's request for a 2-month, 8-month, and ultimately a time-served sentence of 10 ½ months, the Court concludes that the proposed below-Guidelines sentences are not appropriate and that the punishment set forth in the Guidelines is most appropriate.  The Court has also considered the kinds of sentences and range that the Guidelines establishes.  After careful consideration of all the § 3553(a) factors, and the circumstances of the case, and the history and characteristics of the defendant, the Court concludes that a sentence of 16 months is necessary to reflect the seriously of the offense, promote respect for the law, provide just punishment, afford adequate deterrence -- both at a specific and general level, protect the public, avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and because Sandoval-Enrique will be deported as soon as he completes his incarceration, and because the Court does not think that supervised release is appropriate here,

the Court believes that this 16-month sentence reflects fully each relevant factor established in 18 U.S.C. § 3553(a).  The Court believes that this sentence is a reasonable one.  Finally, the Court concludes that the sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act.

　　　　**IT IS ORDERED** that: (i) the requests in the Defendant's Sentencing Memorandum, filed February 11, 2016 (Doc. 25), are denied; and (ii) Defendant Manuel de Jesus Sandoval-Enrique is sentenced to 16-months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David P. Martinez
　United States Attorney
Presiliano A. Torrez
　Assistant United States Attorney
Albuquerque, New Mexico

　　　　*Attorneys for the United States*

Margaret A. Katze
　Federal Public Defender
Albuquerque, New Mexico

　　　　*Attorney for the Defendant*